1

2

3

4

5

6

7   UNITED STATES DISTRICT COURT

8   CENTRAL DISTRICT OF CALIFORNIA

9

10   LYNDA SACKS,                    )        CASE NO: CV08-03370 DSF (AJWx)
                                     )
11               Plaintiff,          )        FINDINGS OF FACT AND
                                     )        CONCLUSIONS OF LAW
12          v.                       )
                                     )
13   STANDARD INSURANCE              )
     COMPANY; COUNTRYWIDE HOME )
14   LOANS, INC. SHORT TERM          )
     DISABILITY PLAN; and            )
15   COUNTRYWIDE HOME LOANS,         )
     INC. LONG TERM DISABILITY       )
16   PLAN,                           )
                                     )
17                                   )
                                     )
18               Defendants.         )
                                     )
19   _____)

20          Plaintiff Lynda Sacks seeks long term disability benefits under the Employee

21   Retirement Income Security Act of 1974 ("ERISA") (29 U.S.C. Section 1001, *et seq.*).

22   Plaintiff contends she is disabled under the terms of the Countrywide Home Loans,

23   Inc. Long Term Disability Plan.  It is undisputed that Standard Insurance Company

24   insured benefits under, and was responsible for funding, the Plan, and made the claims

25   determinations.  After consideration of the parties' trial briefs, the oral argument, the

26

27

28

evidence in the Administrative Record, and the extrinsic evidence offered by Plaintiff[1] on the issue of Standard's conflict of interest, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### The Plan

1. The policies at issue are Standard Insurance Company Group Short Term Disability Policy No. 643382-B ("STD Policy") (001-36)[2], and Standard Insurance Company Group Long Term Disability Insurance Policy No. 643382-C ("LTD Policy") (037-69)[3] (collectively "Policies"), both of which Standard issued to Plaintiff's employer effective January 1, 2005, as amended from time to time.

2. Under the "Allocation of Authority" section of the Plan, Standard has "full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy." (030-31, 063.) Standard's authority includes, but is not limited to:

   1. The right to resolve all matters when a review has been requested;

   2. The right to establish and enforce rules and procedures for the administration of the Group Policy and any claim under it;

   3. The right to determine

---

[1]Trial courts may admit evidence outside of the record on the issue of the "nature, extent and effect" of an administrator's conflict of interest. *Abatie v. Alta Health*, 458 F.3d 955 (9th Cir. 2006). The Court finds the evidence offered by Plaintiff – Dr. Dickerman's deposition transcript – to be relevant to this issue. The portions of the deposition transcript referred to in these Findings are admitted into evidence.

[2]All references are to the last three digits of the Bates numbers of the Administrative Record unless otherwise noted.

[3]Plaintiff's Proposed Findings of Fact and Conclusions of Law suggest that she seeks benefits only pursuant to the Long Term Disability Plan, though her Complaint makes clear she seeks benefits pursuant to the Short Term Disability Plan as well. The Court refers to them collectively as the "Plan."

a.    Eligibility for insurance;

b.    Entitlement to benefits;

c.    The amount of benefits payable; and

d.    The sufficiency and the amount of information [it] may reasonably require to determine a., b., or c., above.

(031, 063.)  The Allocation of Authority provisions conclude that "[s]ubject to the review procedures of the Group Policy, any decision we make in the exercise of our authority is conclusive and binding."  (031, 064.)

3.    A claimant must submit satisfactory proof of disability to Standard.  (061, 029.) The Plan sets forth the criteria a claimant must meet to be considered "disabled."  The Plan requires that a claimant be unable, "as a result of Physical Disease, Injury, Pregnancy, or Mental Disorder . . . to perform with reasonable continuity the material duties of [her] Own Occupation."  (054, 017-18.)

4.    "Own Occupation" is defined as "any employment, business, trade, profession, calling or vocation that involves Material Duties of the same general character as the occupation [a claimant is] regularly performing for [the claimant's] Employer when Disability begins."  (054, 018.)  In determining a claimant's Own Occupation, Standard is not limited to looking at the way the claimant performs her job for her employer, but may also look at the way the occupation is performed in the national economy.  (054,  018.)

5.    Material duties are those "essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation, that cannot be reasonably modified or omitted."  (054, 018.)

**Plaintiff's Occupation**

6.      Plaintiff worked as a mortgage loan underwriter for Countrywide.[4]  The primary duties of her occupation included approving or denying mortgage loans, following mortgage standards, reviewing and evaluating information on mortgage loan documents, and assembling documents in the loan file.  (155.)

7.      A vocational case manager for Standard reviewed Plaintiff's occupational duties and determined that her occupation is a sedentary level occupation with physical demands that include occasional reaching, handling, fingering, talking, and hearing.  (155-156.)  The physical demands of a mortgage loan underwriter are described as "STRENGTH: sedentary [¶] Exert force up to 10lbs. occasionally, or a negligible amount of force frequently to lift, carry, push, pull, or move objects."  (155.)

**Plaintiff's Medical History**

8.      Plaintiff first began experiencing leg pain in 2001.  She contends she began falling at work.  (163.)  In 2003 Plaintiff was diagnosed with a peripheral polyneuropathy, specifically Charcot-Marie-Tooth Disease ("CMT").  CMT is a progressive and degenerative hereditary disease that causes pain and affects mobility.  (163.)  There is no cure for the disease and it affects the nerves and muscles in one's legs, feet, forearms, and hands.  (*Id.*[5])

---

[4]The documents refer to different Countrywide entities, but there apparently is no dispute that Plaintiff was covered by the Plan.

[5] Each party submitted proposed findings of fact and conclusions of law.  The Court required that each side specify whether the opposing party's proposals were admitted, disputed, or irrelevant.  The Court accepts as proved all facts that the parties identify as admitted, and which, though disputed, are adequately supported by the Administrative Record.  The Court also includes facts that a party contended were irrelevant, but which the Court concluded were relevant either to the Court's determination, or to provide context for other facts.  The Court does not accept as true claims made by Plaintiff to her doctors or in letters to the insurer, unless supported by other evidence or admitted by Defendants.  These claims are, however, matters that Standard was aware of and should have taken into account when making its determination.  Both parties disputed numerous allegations that were indisputable based on the Administrative Record, significantly and unnecessarily increasing the amount of time the Court was required to expend on this matter.

9.    In 2004, as a result of her restricted mobility, she moved from her three-story home into a one-story home.  (*Id.*)  In 2006 Plaintiff apparently missed work due to a fall, but returned to work using a walker.  (*Id.*)  She contends that in 2007 the nightly leg pain became unbearable and her primary care physician, Laurie Vos prescribed Nortriptyline for pain.  She claims that the "morning after" side effects made working difficult and slow because her concentration was impaired.  (163-164.)

**Plaintiff's Initial Claim Submission**

10.   Plaintiff ceased work on July 10, 2007, stating that her "[e]xtreme pain and difficulty when walking" prevented her from working.  (103.)  Plaintiff submitted a claim for short term disability benefits with the claim forms provided by Standard.  (94, 106, 109.)[6]

11.   At the time of submission of her claim, Plaintiff was 58 years old and had worked as an underwriter for Countrywide for eleven years.  (071, 161, 164.)

12.   The Doctor's Certificate completed by Eduard Osmonov, M.D., indicated that Plaintiff had difficulty walking and used crutches and/or braces to walk around, had increasing pain in her left hip, felt tired, and had frequent falls. (094.) According to the Certificate, Plaintiff's disability began on July 11, 2007.  Dr. Osmonov anticipated releasing Plaintiff back to her customary work on August 11, 2007.  (*Id.*)

13.   In his Doctor's Certificate dated August 7, 2007, Dr. Yuri Bronstein, a neurologist, stated that Plaintiff had been disabled since July 11, 2007.  (109.) Her diagnosis was: "neuropathy, peripheral (polyneuropathy) disease, Charcot-Marie-Tooth, neuropathy, progressive (inflammatory) demyelinating."  He

---

[6]It appears according to the schedule, (083), that by the time of the final denial of Plaintiff's claim (March 2008), Plaintiff would have been eligible for long term disability benefits under the Plan – if she were permanently disabled.  Standard does not dispute that it contemplated that Plaintiff's claim would "roll over" to the long term phase of the Plan.

stated that Plaintiff had had difficulty ambulating for many years.  She used crutches to get around.  Dr. Bronstein also reported that Plaintiff had severe pain in her left hip and that she had frequent falls.  (*Id.*)  Dr. Bronstein's office notes stated that he supported Plaintiff's request for disability.  The notes also indicate Plaintiff's report that her hands felt "weaker" and that she had been dropping things.  (112.)

14.   Dr. Bronstein's report documents that Plaintiff informed him that she was applying for permanent disability because she was "no longer able to work" and had "difficulty getting from the car, which aggravate[d] her pain."  (*Id.*)  Dr. Bronstein's report documents the following:  1) Plaintiff reported progressive weakness in the lower extremities and intermittent hip pain that has been present since she sustained a fall in early July 2007; 2) Plaintiff denied significant weakness in the upper extremities but related intermittent weakness in her hands; and 3) Plaintiff reported low back pain that was aggravated by lifting things and moving.  (112.)  Plaintiff also stated that she had seen a "healer" and was able to walk independently without crutches for a time, but that this improvement was short-lived and only lasted for a period of one or two months. (*Id.*)

15.   Dr. Bronstein's report lists Plaintiff's medications as Nortriptyline (20 mg. once a day); ibuprofen (800 mg. on a per needed basis); Temazepam (15 mg. on a per needed basis); and hormonal replacement therapy.  (*Id.*)

16.   Dr. Bronstein's examination report notes Plaintiff was in "no acute distress." (*Id.*)  Further, Dr. Bronstein's examination of the upper extremities revealed minimal weakness in intrinsic muscles.  (*Id.*)

17.   Plaintiff visited Dr. Fok, a physical medicine and rehabilitation specialist, on August 13, 2007.  Dr. Fok's report notes Plaintiff had recently developed  back pain, hip pain, and lower extremity weakness.  (117.)  Dr. Fok's report also stated that according to Plaintiff, "the pain somehow disappears."  During the

morning of her visit, Plaintiff had "no more hip pain, no knee pain and no back pain." (*Id.*) Dr. Fok's report further stated as to Plaintiff's hip, back, and pelvic area pain: " . . . apparently it has all disappeared. I see no significant evidence of pathology in her lumbar spine as well as in her hips and knee." (118.)

18.   Dr. Fok's examination report documented that Plaintiff denied any numbness or tingling in her arms or hands. (117.) In fact, Plaintiff felt that her upper extremities were "fairly strong" because she was using Canadian crutches. (*Id.*) Dr. Fok's report documents that Plaintiff complained about numbness in her lower leg and felt that she was getting weaker when she was walking. (*Id.*) Dr. Fok's report, however, states: "The muscles in her lower legs still look quite normal and her hip and knee range of motion is normal without pain." (*Id.*) Overall, Dr. Fok opined that Plaintiff had CMT with a peripheral neuropathy of her lower extremities resulting in moderate weakness, but without significant or aggressive atrophy or weakness. (*Id.*)

19.   During the examination, Plaintiff and her husband inquired about different braces. (117.) Dr. Fok's report documents that he did not see a medical reason to change Plaintiff's current braces. (118.) Instead, Dr. Fok recommended that Plaintiff tie her shoelaces tighter and that Plaintiff obtain different shoes so the current braces would function more effectively. (*Id.*) Dr. Fok referred Plaintiff to the Kaiser orthotics department and suggested additional physical therapy. (*Id.*)

20.   In a letter dated August 24, 2007, Standard acknowledged Plaintiff's claim for disability benefits. The letter stated that it might be necessary to request additional medical, vocational, and financial information before a final decision on Plaintiff's claim. It further stated: "If it becomes necessary to obtain additional information to process your claim, I will let you know." (77.)

**Standard's Claim Evaluation**

21. On August 29, 2007, Dr. Mark Shih, a board-certified physiatrist, conducted a paper review of Plaintiff's claim. (157.) Dr. Shih's review was completed by 2:53 p.m. (084.) Standard apparently did not have a copy of Plaintiff's job description at the time of the review because Standard's records show receipt of the job description on August 31, 2007. (084.) It is not clear what records were in Standard's possession at this time; but as of October 23, 2007, Standard had chart notes only for Plaintiff's August 7, 2007 visit with Dr. Bronstein and her August 13, 2007 visit with Dr. Fok. (192.)

22. Dr. Shih stated that it might not be unexpected that Plaintiff would experience increasing disability and fatigue after trying to ambulate without appropriate assistive devices. Dr Shih noted "increasing disability," and concluded that, although Plaintiff "would be incapable of full time light work activities," she "would be reasonably capable of full time sedentary level work activities under the above noted restrictions." (161.)

23. Standard denied Plaintiff's claim in a four-page letter dated September 5, 2007. Standard noted the records and opinions of these physicians and other information in the file. Standard acknowledged that Plaintiff experienced difficulty walking and standing, but stated that walking and standing were not material duties of Plaintiff's occupation. (174.)

24. Plaintiff was advised that she could request a review, and was informed that she had the right to submit additional information. She was further advised: "Additional information which would be helpful in reconsideration of your claim would be your medical records dated January 3, 2007, through current." (*Id.*)

25. On September 11, 2007, Plaintiff's husband called and asked what they needed to do for the review. He reported that Plaintiff could not walk any longer without falling. He also reported that Plaintiff was on strong medication that made her slow and affected her work. The record indicates: "I explained how

8

1    to request a review.  they will send in more medical." (85.)  The Administrative
2    Record does not indicate that more specific instruction was given.

3  26.  On September 22, 2007, Plaintiff appealed. (163.)  She advised that CMT is an
4        incurable progressive and degenerative hereditary peripheral neuropathy that
5        affects one's mobility and the nerve muscles in legs, feet, forearms and hands.
6        She reported that, as a result of her disease, she had moved into a one story
7        home; she had missed work for almost a month due to a fall in June 2006; she
8        had returned to work with a walker and experienced pain night and day; she was
9        prescribed Nortriptyline for her pain, but the morning side effects made
10       working difficult and slow, requiring her to stay longer than normal at work.
11       She reported that her legs "felt like mush" and that her current braces no longer
12       prevented falls. (*Id.*)

13  27.  In her appeal letter, Plaintiff also included a DVD that she had made for a
14       prosthetic specialist in Las Vegas, Mitch Warner. (164.)  In an email response
15       to Plaintiff, Mr. Warner stated that from his review of the video, Plaintiff had  a
16       very high steppage, compensation of lateral trunk bending, loss of balance,  and
17       equinovas deformity with varus/vagus component.  Mr. Warner did  not
18       comment on Plaintiff's ability to perform sedentary work. *Id.*

19  28.  Plaintiff also reported that she had weakness and numbness in her hands and
20       that she had been dropping things frequently.  Plaintiff advised Standard that
21       the medication that she had been taking did not allow her to perform her job
22       with full concentration.  Plaintiff reported that she had tried "everything [she]
23       could think of to improve [her] health situation [including] acupuncture,
24       physical therapy, water aerobics, braces, canes, and crutches."  Plaintiff advised
25       Standard that she had even consulted a faith healer. (164.)

26  29.  On receiving Plaintiff's letter to Standard wherein she first described a
27       cognitive impairment from her medication, Standard submitted the information
28       to Nurse Colleen Littell, who noted:  "The claimant sent a letter in which she

9

states that medication she is prescribed is affecting her concentration.  There are no records indicating that the claimant has complained of this problem to any of her physicians.  Normally, if a patient describes troubling side-effects the dosage or frequency will be adjusted or a new medication tried." (85.)

30.  Littell concluded that there were no new medical records to review or new information to support impairment from a "sedentary occupation." (086.)

31.  Claims examiner Erica Turner subsequently noted Plaintiff's report of impaired cognition due to medications.  Turner noted Plaintiff's claim that she had been working long hours due to the lack of concentration and this caused her fatigue.  Turner wrote: "questions:  would clmt be precluded from sed occ for walking? would clmt be precluded from work due to lack of concentration even though this is not reported except self reporting?"  (086.)

32.  The file was returned to Nurse Littell, who stated that she would consult with Dr. Shih on October 10, 2007 and review additional information.  (086.)

33.  Dr. Shih was not available.  On October 12, 2007, Nurse Littell met with Janette Green, M.D. (board-certified in internal medicine), who reviewed "a small amount of the documentation available" along with the newly submitted materials and DVD.  (176-79.)  Dr. Green's Physician Consultant report acknowledged that Plaintiff has a long history of CMT and that the chart documentation and DVD show that Plaintiff has a gait abnormality consistent with this disorder.  (*Id.*)  Dr. Green's report noted that "[i]t is evident from the DVD that she has more difficulty ambulating with crutches, which seems to be more from a coordination aspect with the use of crutches."  (*Id.*)  Dr. Green's report concluded that "the documentation, including the DVD footage, does not support that the claimant could not perform the duties of a sedentary level occupation, especially one that she has previously demonstrated the ability to perform.  If additional documentation becomes available, I will be happy to rereview the claim."  (*Id.*)

10

34. Nurse Littell thereafter reported that Dr. Green did not find that Plaintiff's peripheral neuropathy of her distal lower extremities would preclude her from working in her own sedentary occupation. According to Nurse Littell's notes, Dr. Green formed this opinion because this was not a "new condition" and because Plaintiff had demonstrated an ability to work with this condition in the past. Therefore, Dr. Green concluded she should be able to continue working. Nurse Littell also reported that Dr. Green commented that Plaintiff was no more likely to fall at work than at home. (086.)

35. It is not clear what records were available as of the date of Dr. Green's review or which of those she may have reviewed. As noted previously, however, as of October 23, 2007, Standard had chart notes only for Plaintiff's August 7, 2007 visit with Dr. Bronstein and her August 13, 2007 visit with Dr. Fok. (192.)

36. On October 11, 2007, Standard's Benefits Review Department upheld the denial of Plaintiff's claim. (171, 244.)

**The Appeal Proceedings**

37. Plaintiff's claim was then referred to Kenneth Biggs, a Benefits Review Specialist with Standard. (87.)

38. Mr. Biggs reviewed the file and prepared a memorandum dated October 17, 2007. (184.) In this memorandum, Mr. Biggs noted that Plaintiff had a difference of opinion with Dr. Fok and had visited a Dr. Kay, who agreed that different braces might help her. The memorandum states: "Because there may be additional medical information available, namely records from Dr. Kay, as well as additional records reflecting the possibility of ongoing difficulties, I will call Ms. Sacks to determine whether she would like to submit this information." (185.) Mr. Biggs' memorandum also erroneously referred to another claimant, Ms. Carr. The apparent standard of disability in Ms. Carr's case was that of "any occupation." (*Id.*)

11

39.    On October 18, 2007, Mr. Biggs had a telephone conversation with Plaintiff, which he documented in a memorandum dated October 23, 2007. (191.) According to Mr. Biggs' memorandum, in this conversation, Plaintiff explained that Dr. Vos was her primary care physician and she had visited Dr. Vos due to an increase in pain.  She also reported that Dr. Kay disagreed with Dr. Fok's prior opinion that her braces were adequate.  Plaintiff repeated her earlier report that her hands were now weakened and she experienced numbness and tingling. Plaintiff also reported that she had pain when sitting for long periods.  Plaintiff reported that taking Nortryptyline caused her to feel drowsy and fuzzy until noon.  (*Id.*)

40.    Mr. Biggs' memorandum indicates that he advised Plaintiff that there was additional medical information that might help Standard to understand her condition better.  Mr. Biggs advised Plaintiff that the only chart notes Standard had were from her office visits with Drs. Bronstein and Fok in August 2007. (192.)  According to Mr. Biggs' memorandum, there was discussion of suspending Standard's review to obtain the medical records. (191.)  Plaintiff reported that all of her physicians were at Kaiser and Plaintiff's husband offered to drive his wife to Kaiser so that she could sign the necessary authorizations. Mr. Biggs stated he would request the medical records from Kaiser.  (192.)

41.    On October 19, 2007, Mr. Sacks emailed Standard and reported that Standard was already approved to request medical information regarding Plaintiff from Kaiser.  Standard merely had to fax a request.  (189.)

42.    On October 22, 2007, Standard faxed a request for "copies of Ms. Sacks' entire medical record, including chart notes, progress notes, etc. from July 11, 2005 to the present." (195.)  However, the only specific physician referenced in the Authorization For Use and/or Disclosure of Medical Information was Dr. Bronstein.  (196.)

12

43. On about October 24, 2007, Kaiser sent medical records, including records from Drs. Bronstein and Fok, to Standard. (201, 220, 215-216.) The records were received October 29, 2009. (200.) There is no suggestion in the Administrative Record that Dr. Kay's medical records were included; the Court concludes that Dr. Kay's records were not provided.[7]

44. The medical records included in this submission were from 2006-2007. The medical records showed the following treatments and evaluations of Plaintiff's medical condition:

• June 29, 2006: Pain in back. Severe back pain. Has braces. Stiff gait and uses walker. Chronic leg pain and increased lower back pain. Pain worse with standing. (223.)

• June 27, 2006: Urgent Care Treatment. *Progressive* worsening of gait with stumbling and falling. Pain was attributed to stress when trying to balance herself. Plaintiff was referred to physical therapy and taken off work. (224.) Immediate follow up care noted her stiff gait and that the use of a walker caused her to bend forward. (223.) Follow up physical therapy noted recent falls. Plaintiff was now using a 4 wheeled walker more frequently and was taking Vicodin. (221.)

• July 25, 2006: The Outpatient Neurological Consultation Report from Dr. Bronstein (which describes Plaintiff as a 67-year old woman) states that a brace helped slow progress of her disease until the previous month when she fell and developed severe low back pain. There was no evidence of radicular pain. He noted that Vicodin helped the pain. He ordered a repeat nerve conduction study to subjectively document worsening of neuropathy, and a repeat dose of steroids. (220.)

[7]Although Plaintiff makes much of this, it is not clear how evaluation of Dr. Kay's records would have assisted her claim.

13

• August 10, 2006: The Outpatient Consultation Report from Dr. Fok documents a decrease in pain. Vicodin was helpful. "Her gait is weak in the lower extremity. She needs some assistance in order to ambulate. When she ambulates, she will walk slow . . . ." (215.) She was instructed to do more water exercises and *avoid long sitting*. (216.) Her upper extremity strength was 4+ oe 5/5. (215.) He did not think Plaintiff needed any physical therapy or epidural injection to the spine because she was improved. (216.)

• September 15, 2006: EMG study for comparison to studies from 2002 and 2003. The neuropathy in her legs had "significantly progressed bilaterally." "This suggest[ed] a slowly progressive axonal progress involving predominantly the peroneal motor nerves." The study showed that Plaintiff's left ulnar CMAP and SNAPs were "normal." (212.)

• September 21, 2006: Dr. Bronstein's Clinic progress record notes low back pain, with increased fatigue, uses crutches with braces, progression of disease. (210.)

• August 13, 2007: Dr. Fok examines Plaintiff, who reports recent back pain, progressive lower extremity weakness, and left hip pain. At the time of the examination she did not report pain in her hips and back. (117.) As noted by Standard's reviewing physician, Dr Fok's examination was "un-detailed." (238.)

• August 28, 2007: Doctor's Certificate by Dr. Bronstein states Plaintiff is under weekly care and is permanently disabled. The cause of the disability is Charcot Marie Tooth Disease which causes difficulties in ambulating for "last many years." Uses crutches to get around, with *"increasing* severe pain in left hip. Feels tired with frequent falls." (140.) Dr. Bronstein also attached office notes of August 2007 visits to Kaiser by Plaintiff. These notes described an August 7, 2007 consultation for *progressive* weakness in the lower extremities as well as intermittent pain in the lower extremity as

14

well as hip.  According to Dr. Bronstein, Plaintiff denied significant weakness in her upper extremities, but felt that "at times her hands [are] weaker and she drops her things."  Since the last consultation, Plaintiff had consulted a faith healer, but only experienced short relief.  Dr. Bronstein's "Impression and Plan" was that Plaintiff's CMT was *progressive*, with neuropathy.  She had increased lower back pain, hip pain, with more aggravation since her recent fall.  Degenerative spine disease as confirmed by prior MRI's.  Dr. Bronstein told Plaintiff that he would support her application for disability.  (143.)  Dr. Bronstein referred Plaintiff to Dr. Fok to discuss obtaining different braces.  He also ordered repeat MRIs.  It was noted that the time of the consultation was 5:44 p.m.  (144.)

•   September 7, 2007: Physical Therapy Evaluation: Notes atrophy of legs and right calf.  "Pt reports grip is weakening."  It was noted that patient was waiting for a second opinion from Physical Medicine to order new braces.  There is a notation regarding weakness in the hands and the recommendation for strengthening exercises.  (203.)

45.   Mr. Biggs then prepared a memorandum, requesting an internal neurological paper review of the file.  (235.)  He stated that Plaintiff was a mortgage underwriter who wore braces and "occasionally uses a cane and a walker."  He noted the side effects from medication.  He asked the physician to address Plaintiff's ability to perform sedentary or light work, her risk of falls, ongoing pain, side effects from Nortriptyline and progressive numbness and weakness.  Mr. Biggs advised the consulting neurologist of the existence of the 2006 Kaiser EMG testing, which had both upper and lower extremity testing.  (212, 235.)

**Dr. Dickerman's Initial Review**

46.   As part of the independent review process, Plaintiff's claim file was referred for a paper review to Dr. Elias Dickerman, a board-certified neurologist, and

15

assistant professor at UC Davis.  (241-43.)  Dr. Dickerman reviewed the medical records and his report dated November 3, 2007, stated that Plaintiff's lower extremity weakness was not in question.  (248.)  Dr. Dickerman opined that Plaintiff would be prevented from prolonged standing, walking, going up and down stairs, kneeling, squatting, and lifting.  (248.)  Dr.  Dickerman's report also stated that Plaintiff's lower extremity weakness could be "somewhat compensated" for by use of AFOs (ankle-foot orthoses) or a motorized scooter. (*Id.*)

47.   Dr. Dickerman's report also stated that Plaintiff did not appear to have  any chronic pain syndrome, and "there is no documentation to support any  specific side effects of the low-dose Nortriptyline."  (248.)

48.   Dr. Dickerman noted Plaintiff's recent complaints about numbness and weakness in her upper extremities.  (247-48.)  He questioned whether these symptoms could be due to a progression of Plaintiff's CMT or some other condition, and whether this could be a limiting factor in her occupation.  (*Id.*)

49.   In his written medical review, Dr Dickerman acknowledged that Plaintiff had problems with her lower extremities.  He described the impairment in her lower extremities as a "significant decrease in power of the peroneal nerves bilaterally–to less than 10% of normal."  (238.)  Dr. Dickerman then noted that if it were the case that CMT began affecting Plaintiff's upper extremities, "it is the new involvement of the upper extremities that would make it unlikely that she could perform sustained sedentary activities requiring frequent fingering, handling, etc., even within the sedentary capacity."  (240.)  Dr. Dickerman reported that side effects of the medication were "not supported" by the records. Dr. Dickerman recommended an examination by a neuromuscular specialist to evaluate Plaintiff's ability to use her upper extremities.  (248.)  He recommended an independent medical exam for electrodiagnostic testing to determine "possible involvement of the process in the upper extremities."  Dr.

1  Dickerman apparently mis-read the 2006 EMG testing previously conducted at

2  Kaiser, for he stated:  "It is also to be emphasized that at no time was there a

3  study of the upper extremities."  (238.)[8]  In fact, the 2006 Kaiser EMG testing

4  showed the left ulnar nerves were normal.  (212.)

5  50.  Dr. Dickerman has worked for Standard as a medical consultant since March

6  2000.  (Chandler Decl., Ex. A, p. 13.)  Although his original hourly charge to

7  Standard was $150 to $175 an hour, he he has gradually negotiated increases

8  with Standard since 2000.  In 2007 Dr. Dickerman's rate was increased to $235

9  an hour.  (*Id.*, p.14.)  When Dr. Dickerman started reviewing claims for

10  Standard,  he received no formal training regarding reviewing claims.  (*Id.*, p.

11  15.)

12  51.  In 2006 and 2007, Dr. Dickerman earned approximately $230,000 annually

13  from Standard.  In 2008, his income from Standard was about $10,000 less.

14  (*Id.*, p. 20.)

15  52.  Dr. Dickerman has a laminated card in his cubicle at Standard containing the

16  DOT exertional strength descriptions of "sedentary, light, medium, heavy and

17  very heavy."  These DOT strength descriptions do not include any cognitive

18  components.  (*Id.*, p. 34-35.)  Dr. Dickerman did not know the DOT cognitive

19  requirements for Plaintiff's occupation as reported on the job description

20  contained in the Administrative Record.  (*Id.*, p. 40.)

21  **IME With Dr. Wu**

22  53.  Two months after Dr. Dickerman's report, Standard arranged for a medical

23  examination by Dr. Ju-Sung Wu.  (299.)  Dr. Wu was asked to describe "the

24  claimant's ability to return to performing full time work in their [sic] own

---

[8] In subsequent communications about the requested testing, Plaintiff informed Standard that she had EMG testing in 2006.  Although the claim representative "quickly reviewed" the 2006 EMG testing conducted at Standard, he also incorrectly noted that it listed only lower extremity results. (255.)  The 2006 testing at Standard referred to an ulnar CMAP and ulnar SNAPs.  (212.)

occupation as an Underwriter (see enclosed DOT report), or in any sedentary

occupation (refer to the enclosed definitions)." (300.) Dr. Wu was also asked

to address the issues raised by Plaintiff in her appeal letter, as follows:

> Please address the issues in her September 22, 2007 letter: her risk of
>
> falls, ongoing pain, side effects from Nortriptyline, progressive numbness
>
> and weakness of her hands and fingers . . . .
>
>> C.  Are Ms. Sacks' complaints of ongoing severe pain supported
>>
>> by the available medical evidence?  Please explain.
>>
>> D.  Are Ms. Sacks' complaints of side effects from her
>>
>> Nortriptyline supported by the available medical evidence?  Would
>>
>> you expect this side effect to diminish over time?  Please explain.

(236.)

54.   The medical examination took place at 4:00 p.m. on January 28, 2008.  (302.)

The Administrative Record does not document what records were sent to Dr.

Wu.  Dr. Wu's report referenced only the Standard medical reviews by Drs.

Shih, Green, and Dickerman; certain, but not all of Plaintiff's Kaiser office

visits; an MRI; and the previous 2006 testing.  (277-286.)  Dr. Wu performed an

EMG study and a nerve conduction study of Plaintiff's upper extremities.  Dr.

Wu noted Plaintiff's report that the difficulties of performing her job were due

to the ambulation, the fact that one hand would cramp up while typing and that

her medication made it difficult to concentrate.  Dr. Wu characterized the

abnormalities in Plaintiff's hands as "very mild bilateral carpal tunnel

syndrome."  He noted the findings are "very subtle and patient may not even

have clinical awareness of the problem."  He further noted a "mild weakness in

hand grip."  He did not see significant limitation in the use of her hands, but

recommended that she take "frequent breaks, such as 10-15 minutes every 2

hours."  Dr. Wu concluded that results of the EMG study suggested distal

denervation, which "can be seen in patient's [sic] with neuropathy, cervical

myelopathy, or motor neuron disorder."  Dr. Wu stated that there was no evidence of peripheral neuropathy or axonal neuropathy in the study.  (*Id.*)

55.  Dr. Wu suggested that a further study of the upper extremities should be conducted:

> The presence of high amplitude motor units in the distal muscles of both upper extremities needs to be evaluated for the possibilities of neuropathy, cervical myelopathy or radiculopathy or motor neuron disorder. . . .  I would also recommend to repeat the EMG/NC of both upper extremities in my office.

(284.)

56.  Dr. Wu did not address whether Plaintiff could perform her job as an underwriter.  Rather, Dr. Wu stated: "Patient is still able to [sic] sedentary work provided with frequent breaks, safety precautions and good handicap access or measures." (285.)

57.  Dr. Wu's report noted that Plaintiff stated her medication made her drowsy and made it difficult to concentrate.  (278, 283-284.)  He noted that she presented as "awake, alert and oriented to time, place and person." (280.)  With respect to Standard's question as to whether the side effects from her pain medication caused limitations, Dr. Wu responded: "This patient should discontinue Nortriptyline [sic] if she is concerned about tiredness, drowsiness, decreased concentration and risk of fall and replace [sic] with other medication for neuropathy . . . . . (285.)  Dr. Wu did not specify what "other medication" could be prescribed for neuropathy or whether such medication would have a similar effect.  (285-286.)

58.  On receipt of Dr. Wu's report, the Standard claim representative called Dr. Wu to "clarify" his recommendation for further testing.  The claim representative explained that Standard only wanted Dr. Wu "to examine the claimant for

1    Sedentary Level capabilities." (293.)  In response, Dr. Wu's office responded
2    that they "understood" "but that they still feel that it would be necessary to
3    draw a comparison due to a possible disease process." (*Id.*)  The additional
4    testing was not requested or performed.

5    **Dr. Dickerman's Subsequent Review**

6    59.    Dr. Dickerman reviewed Dr. Wu's report in March 2008.  In November 2007,
7           Dr. Dickerman had noted the possibility that "new involvement" of the disease
8           in Plaintiff's upper extremities could make it unlikely that Plaintiff could
9           perform sustained sedentary activities.  (240.)  However, in his March 2008
10          report, when referring to the November 2007 inquiry, Dr. Dickerman stated that
11          the "issue was whether or not she had significant evidence of involvement of
12          the upper extremities secondary to the diagnosis of peripheral neuropathy and
13          Charcot-Marie-Tooth disease that would prevent her from performing a
14          sedentary occupation." (319.)

15   60.    According to Dr. Wu, the EMG study that he conducted showed "very
16          mild bilateral carpal tunnel syndrome with predominance sensory
17          involvement" and "features suggested for right ulnar neuropathy at the
18          elbow." (284.)  Dr. Dickerman found "no clinical correlates with the
19          electrodiagnostic abnormalities that [Dr. Wu] saw." (319.)  He
20          concluded: "Overall, therefore, these records and examination suggest
21          that [Plaintiff] is in fact capable of performing sedentary occupations
22          with no significant involvement clinically of the upper extremities."
23          (320.)

24   **Standard's Final Decision**

25   61.    On March 6, 2008, the same day that Standard's Administrative Review Unit
26          received Dr. Dickerman's opinion, Standard upheld the denial of Plaintiff's
27          benefits in a nine-page letter.  (325.)  In this denial, Standard repeated that
28          under the appropriate definition of disability, Standard was required to

1    "evaluate information about your Own Occupation and medical information

2    about your conditions to determine whether you were able to work and perform

3    the Material Duties of your Own Occupation with reasonable continuity."

4    (326.)  In the letter, Standard used the U.S. Department of Labor's classification

5    of an underwriter as "sedentary work" and the Department of Labor's definition

6    of "sedentary work" to identify plaintiff's "Own Occupation." (*Id.*)

7   62.   In the denial letter, Standard noted that Plaintiff complained of side effects of

8    her medication and that Plaintiff stated she had to work longer hours to

9    compensate for this medication-induced lack of concentration.  (329.)  Standard

10    found that "[b]ased on the medical information in [Plaintiff's] claim file

11    concerning [her] lower extremities, Plaintiff was capable of sedentary work.

12    (331.)[9]  Notwithstanding Dr. Wu's statement that testing revealed findings that

13    can be seen in patients with neuropathy, cervical myelopathy, or motor neuron

14    disorder, it was stated that Plaintiff "might not feel any symptoms due to [her]

15    CTS and cubital tunnel."  (331.)  It was stated that gripping and pinching

16    frequently and repetitively were not material duties of her occupation therefore,

17    her impairments did not affect her ability to work.  (*Id.*)

18   63.   Although Plaintiff reported to Dr. Wu that she could only maneuver a manual

19    wheel chair for short distances,  Standard determined, without reference to

20    evidence, that Plaintiff was "able to maneuver a wheelchair, whether it [was] a

21    manual or powered" wheelchair.  (331.)  Although Standard acknowledged that

22    Plaintiff "experienced pain with extended sitting," it asserted that she was able

23    to change positions by standing and walking.  (331.)  Similarly, Standard

24    acknowledged that Plaintiff had "several falls at home, and that [she has] also

25

26   ──────────────

27   [9]To the extent the denial is based on Dr. Green's analysis, the Court notes again that Dr. Green stated she had reviewed only a small amount of the documentation available.  Moreover, according to Mr. Biggs, by October 23, 2007, Standard only had

28   chart notes for Plaintiff's August 7, 2007 visit with Dr. Bronstein, and her August 13, 2007 visit with Dr. Fok.

fallen while at work." It also acknowledged that her risk of falling may increase as her disease progresses. Standard dismissed the consequences of falling at work, apparently because it concluded the chances of "falling at work, were, is [sic] no greater than [the] risk of falling at home." (332.)

64. Finally, Standard acknowledged – but dismissed – Plaintiff's complaints of sedation by her pain medication. Although Standard admitted that Plaintiff's complaints were "documented," it stated that the consulting physician did not find medical evidence to "support that [Plaintiff is] sedated or that [her] sedation prevents [her] from working." Rather, Standard stated that during Plaintiff's medical examinations, she was "awake, alert and oriented."[10] Standard also adopted Dr. Wu's suggestion that Plaintiff should just discontinue the pain medication if she was experiencing sedation side effects and concluded Plaintiff was not impaired due to her use of Nortryptaline. (332.) Plaintiff was advised that Standard had completed its ERISA review and that Plaintiff's recourse was to contact the State of California. (333.)

## CONCLUSIONS OF LAW

65. The Plan grants Standard discretion in considering disability claims. However, Standard also funds the benefits provided under the Plan and makes the final decision on appeal. Standard therefore has a structural conflict of interest in its administration of the Plan. *Montour v. Hartford Life & Accident Ins. Co.*, 2009 WL 3856933 *5 (9th Cir. 2009). Accordingly, this Court "must take into account the administrator's conflict of interest as a factor in the analysis." Id., citing *Metro. Life Ins. Co. v. Glenn*, 128 S.Ct. 2343, 2346, 2348, 171 L.Ed.2d 299 (2008) ("*Metlife II*")[11] and *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006).

---

[10]As noted previously, the Administrative Record indicates that Plaintiff's medical examinations were in the afternoon.

[11]The Ninth Circuit refers to this case as *Metlife II*, and this Court does the same.

22

66.   "*More particularly, the court must consider numerous* case-specific factors, including the administrator's conflict of interest, and reach a decision as to whether discretion has been abused by weighing and balancing those factors together."  *Id.*, citing *Metlife II*, 128 S.Ct. at 2351-52 (describing the garden variety "combination-of-factors method of review").

67.   Pursuant to the instructions in *Montour*:

Under this rubric, the extent to which a conflict of interest appears to have motivated the administrator's decision is one among potentially many relevant factors that must be considered.  Other factors that frequently arise in the ERISA context include the quality and quantity of the medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records, whether the administrator provided its independent experts with all the relevant evidence, and whether the administrator considered a contrary SSA disability determination, if any.

*Id.* (brackets and internal quotation marks omitted).

68.   The facts and circumstances of the particular case before the Court dictate the weight to be given to the conflict.  *Id.* at *6.  This factor is probably of the greatest importance where "*circumstances suggest a higher likelihood that it affected the benefits decision*, including, *but not limited to*, cases where an insurance company administrator has a history of biased claims administration."  *Id.*, *quoting Metlife II*, 128 S.Ct. at 2351; and *Abatie*, 458 F.3d at 967 (holding that in weighing a conflict of interest, the court's discretionary review must be "informed by the nature, extent and effect" that conflict may have had "on the decision-making process").

69.   In other words, while "abuse of discretion" remains the standard of review, the conflict must be weighed in determining whether there has been an abuse of discretion.  If the facts and circumstances of the case

indicate the conflict may have tainted the entire administrative decisionmaking process, the court should review the administrator's stated bases for its decision with enhanced skepticism: this is functionally equivalent to assigning greater weight to the conflict of interest as a factor in the overall analysis of whether an abuse of discretion occurred.

*Id.*

70.   The Supreme Court's decision in *Metlife II* has put administrators on notice that courts will consider efforts to achieve claims administration neutrality – and Standard made some efforts in that regard.  For example, Standard obtained an IME.  However, when its independent examiner Dr. Wu recommended further tests, Standard declined.  Standard refused to authorized the specific limited testing required, even though Dr. Wu explained why it was necessary to his analysis.  Standard asked for Dr. Wu's evaluation in an open-ended and non-adversarial manner, but failed to follow up when the responses were incomplete in a way that assisted Standard's decision to deny benefits.  While Plaintiff provides no evidence of Standard's rate of claims denials, she provides some evidence relating to Standard's expert Dr. Dickerman.  Dr Dickerman is clearly not entirely dependent on Standard, but he does receive a significant amount of income each year from his work for Standard.  And Standard provided no evidence that it "walled off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits."  *Id.*, *quoting Metlife II*, and *8.

24

71.    In weighing the evidence, this Court finds that an analysis of the case-specific factors establishes that Standard's claim decision was tainted by its financial interest.  Therefore, the Court must view Standard's claim decision with higher skepticism.  The facts that demonstrate that Standard's claim decision was influenced by its own financial interest include, but are not limited to:

•    Standard's initial denial letter did not advise plaintiff what type of evidence to submit in support of her claim.  (172.)  If a claim is initially denied, an ERISA administrator is required to notify an insured of the specific information needed to support the claim.  *Saffon v. Wells Fargo*, 522 F.3d 863, 870-71 (9th Cir. 2008).  A request for "medical evidence" or "information which you believe is relevant" is insufficient.  *See id.* The purpose of this requirement is to guarantee that an ERISA claimant is given the opportunity to submit evidence that the *administrator* deems relevant to prove the claim.  *See id.*

•    Standard used erroneous occupational criteria to evaluate Plaintiff's claim.  Instead of evaluating Plaintiff's ability to perform her "Own Occupation," which admittedly had cognitive requirements, Standard asked its examining physician to opine on Plaintiff's ability to perform "any sedentary occupation."  (300.)  When the independent physician Dr. Wu  asked for permission to conduct further testing on Plaintiff's upper extremities, Standard refused, again repeating that it was only seeking an opinion as to whether plaintiff could perform "any sedentary occupation."  (293.)  Standard's own vocational case manager had concluded that Plaintiff's occupation required occasional reaching, handling, and fingering.  (155-156.)  It is error to evaluate a claimant's disability under the DOT exertional  strengths of "sedentary, light, etc." when the relevant plan definition is the more generous "own occupation" criteria.  *See Gaither v. Aetna*, 388 F.3d 759 (10th Cir. 2004); *Mizzell v.*

*Paul Revere Life Ins. Co.*, 118 F.Supp.2d 1016, 1022 (C.D. Cal. 2000).
Standard's obstinate refusal to recognize this as an issue and its rejection
of Plaintiff's generous offer before this Court to have the matter
remanded to evaluate her claim under the "Own Occupation" test is
further evidence of its bias.

•      Plaintiff advised Standard that the side effects of her medication
made it difficult for her to work during the first half of the day.  (163-
164.)  Standard clearly recognized that Plaintiff's medication had the
potential of providing a disabling restriction, because it asked Dr. Wu
whether the claimed side effects would restrict her ability to perform a
"sedentary occupation."  (236, 299.)  Instead of answering the question,
Dr. Wu merely concluded that Plaintiff could discontinue the medication
that had been prescribed by her physician.  (285.)  Rather than returning
to Dr. Wu for a specific response to the question it had asked, Standard
adopted this recommendation in its claim denial.  (332.)  An
administrator abuses its discretion when it fails to consider how the side
effects of a claimant's medication impact the claimant's ability to
perform her "own occupation."  *See Godfrey v. BellSouth Telecomms.,
Inc.*, 89 F.3d 755, 759 (11th Cir. 1996); *Archuleta v. Reliance Standard
Life Ins. Co.*, 504 F.Supp.2d 876, 886 (C.D. Cal. 2007); *Adams v.
Prudential Ins. Co. of Am.*, 280 F.Supp.2d 731, 740 (N.D. Ohio 2003).

•      In the final decision on appeal, Standard acknowledged that
Plaintiff's complaints of sedation were documented.  (358.)  However,
Standard rejected this aspect of her claim because of an absence of
information in the medical records to support impairment from sedation.
There was "no evidence" regarding the sedation issue because Standard
had requested an opinion from Dr. Wu on the issue, who did not answer
the question.  Instead of returning to Plaintiff's physicians or Dr. Wu,

Standard just denied the claim.  This violates an administrator's duty to fully investigate a claim.  If an administrator requires information to evaluate a claim, it must ask for it.  It is not free to reject the claim merely because of an absence of information.  *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 870 (9th Cir. 2008).

• At least some of the medical reviews were based on incomplete records.  Drs. Shih and Green conducted their medical reviews without the majority of Plaintiff's medical records and without the benefit of her job description.  Dr. Dickerman did not know the cognitive demands of the DOT job description for an Underwriter.  (Chandler Decl., Ex. A, p. 35.)  It is not clear whether Dr. Wu was given all of Plaintiff's medical records.  Supplying incomplete information to medical or vocational experts is a matter of "serious concern," *MetLife II*, 128 S.Ct. at 2352, and is certainly one of the case- specific factors to be considered in evaluating the weight to give to a structural conflict.  *See Montour*, 2009 WL 3856933 at *9-10 (providing a nonexclusive list of considerations).

72. Considering the case-specific factors as required by *Montour*, the Court finds that Standard failed to investigate the claim adequately, failed to measure plaintiff's disability by correct Plan criteria, and failed to engage in a "meaningful dialogue" as mandated by *Saffon*.

73. That Plaintiff had previously worked with her condition should not have been given significant weight by Standard, as her condition was clearly one that worsened progressively.  Dr. Shih did not have current information.  Contrary to the opinions of the Standard reviewing physicians, Plaintiff's medical records did document the progression of her disease.  Finally, Standard did not follow the recommendation of Dr. Wu to conduct follow-up testing to determine the extent of the progression of Plaintiff's disease.  Standard's failure to follow Dr.Wu's requests for additional testing negates any positive weight it might

27

obtain in the balancing process for retaining an independent expert in the first place.

74.    The Court is not persuaded by Standard's argument that Plaintiff's statement regarding her request to work from home is probative of Plaintiff's ability to work in the work force.  In any event, this rationale was not the basis for Standard's initial denial of Plaintiff's claim.  An administrator may not rely on post-litigation rationale to buttress its claims decision.  This has the effect of "sandbagging" a claimant, who has no opportunity to present new evidence on the issue.  *See Jebian v. Hewlett-Packard Co. Employee Benefits Org. Protection Plan,* 349 F.3d 1098, 1104-05 (9th Cir. 2003).

75.    The Court also finds that Plaintiff's medical evidence was credible and supported her inability to perform the substantial and material duties of her own occupation.  Even under Standard's criteria of the DOT "sedentary occupation," walking and standing were material duties of Plaintiff's occupation.  The DOT definition of "sedentary" requires one to walk and stand up to 33% of the day.  Standard acknowledged that Plaintiff was required to stand or walk by advising Plaintiff that she could avoid the pain of prolonged sitting by alternating between sitting and standing/walking.

76.    However, Plaintiff could not walk or stand without assistance.  By requiring Plaintiff to perform her job by alternating between sitting and standing/walking, Standard was requiring Plaintiff to perform tasks that the medical evidence indicated Plaintiff could not perform unassisted or without pain.

77.    The Court finds that Plaintiff's complaints of pain and fatigue are well documented in the medical records.  Plaintiff's complaints are credible in view of her struggle to remain at work, despite the presence of a severe and debilitating disease.  Standard recognized the relevance of the issue, had the opportunity to obtain evidence regarding Plaintiff's cognitive impairment, and even requested a medical evaluation from Dr. Wu.  When Dr. Wu failed to

1    address the issue directly, Standard simply accepted the nonresponsive

2    evaluation.  The Court finds Plaintiff's complaints of sedation that prevented

3    her from performing her "own occupation" to be unrebutted.

4    78.    Standard abused its discretion in making the determination that Plaintiff was not

5    disabled from her own occupation within the meaning of the Plan.

6    **CONCLUSION**

7    For the above-stated reasons, this Court reverses the claim decision and orders

8    that Plaintiff be reinstated to the Plan, with the payment of benefits to the date of

9    Judgment.  Thereafter, Standard will administer Plaintiff's claim according to the

10   terms of the Plan.  Plaintiff is also entitled to an award of attorneys' fees and costs.

11   Plaintiff may move for such an award in accordance with the Local Rules, and the

12   Court's  Order.

13

14   Dated: November   30, 2009

15                                        The Honorable Dale S. Fischer
                                          United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28